WMP:JPL
F. #2006R00740

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| UNITED STATES OF AMERICA | S U P E R S E D I N G |
| | I N F O R M A T I O N |
| – against – | |
| | Cr. No. 06-628 (S-2) (NGG) |
| JACOB ALEXANDER, | (T. 15, U.S.C., §§ 78j(b) and 78ff; T. 18, |
| also known as "Kobi Alexander," | U.S.C., §§ 2 and 3551 et seq.) |
| | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE UNITED STATES ATTORNEY CHARGES:

At all times relevant to this Superseding Information, unless otherwise indicated:

THE CORPORATION

1. Comverse Technology Inc. ("CTI") was a New York corporation with its headquarters in Woodbury, New York.[1] Beginning in 1986, CTI was a publicly traded corporation, the common stock of which was traded on the NASDAQ National Market System ("NASDAQ"). Through Comverse Inc., a wholly-owned subsidiary, CTI was a provider of software and software systems for communication and billing services. CTI was a component stock in the S&P 500 and NASDAQ-100 indices. CTI's shareholders were located throughout the United States, including in the Eastern District of New York.

2. As a public company, CTI was required to comply with the rules and regulations of the United States Securities and Exchange Commission (the "SEC"). The SEC's

---

[1] In 2005, CTI moved its headquarters to Manhattan, but continued to maintain offices on Long Island.

rules and regulations were designed to protect members of the investing public by, among other things, ensuring that a company's financial information was accurately recorded and disclosed to the investing public. Under the SEC's rules and regulations, CTI and its officers were required to file with the SEC quarterly reports (on Forms 10-Q) and annual reports (on Forms 10-K), which included financial statements that accurately presented CTI's financial condition and the results of its business operations in accordance with Generally Accepted Accounting Principles ("GAAP"). CTI was also required to disseminate and file with the SEC annual proxy statements to shareholders (on Forms 14-A) setting forth accurate information about matters to be brought to a vote at annual shareholder meetings.

## THE DEFENDANT

3. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," was a founder of CTI, and served as the Chief Executive Officer ("CEO") of CTI and Chairman of the Board of Directors.[2] ALEXANDER reviewed and approved CTI's public filings. As CEO and Chairman, ALEXANDER signed CTI's annual and quarterly public filings. ALEXANDER received a bachelor's degree in economics from Hebrew University of Jerusalem, and a master's degree in business administration from New York University. On or about May 1, 2006, ALEXANDER resigned his positions from CTI in the midst of an internal investigation by a Special Committee of CTI's Board of Directors (the "Special Committee").

4. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, devised a scheme to defraud predicated on the backdating of CTI's option grants.

---

[2] ALEXANDER was a director of CTI from its formation, and became Chairman in September 1986. ALEXANDER served as President of CTI from its formation until January 2001. In April 1987, ALEXANDER was named CEO.

2

## THE OPTIONS BACKDATING SCHEME

### The Process of Granting Options

5.  An option is the right to buy a share of stock on a future date (typically at the end of a vesting period) at a set price, known as the "exercise" or "strike" price. The exercise price is ordinarily the trading price of the stock (i.e., the fair market value) on the day that the option was granted by a corporation's board of directors or, typically, the board's compensation committee. The holder of an option makes a profit by exercising the option to buy the stock at the end of the vesting period at the locked-in exercise price, and selling the stock when it is trading at a higher price than the exercise price. Options with an exercise price equal to the current trading price of the underlying stock are commonly referred to as being "at the money"; options with an exercise price below the current trading price of the stock are "in the money"; and options with an exercise price above the current trading price of the stock are "under water." Options that are in the money have a so-called "paper profit" associated with them, meaning that the options have value based on the difference between the exercise price and the current trading price, although the holder has not yet reaped the actual profit by exercising the option and selling the stock, and may need to wait until the end of a vesting period to do so.

6.  When a company grants in-the-money options, i.e., options with an exercise price below the current trading price, this event has significant accounting, disclosure and tax consequences as set forth below. One way for executives to reap the benefit of in-the-money-options while evading these accounting, disclosure and tax consequences is to backdate the options so as to conceal the fact that the company has granted in-the-money options.

3

The Backdating of Options

       7.    Backdated options are options that appear to have been granted on a certain date at the fair market value (i.e., the trading price) of the underlying stock on the date of the grant, but were actually granted on a later date. One motive for backdating is to fix a lower exercise price for the options, thereby awarding in-the-money options and inflating the gain to the holder of the options. Backdated options, therefore, are typically backdated to a date on which the stock was trading at a lower price than the price on the day of the actual grant. By fixing an earlier date as a grant date, the company makes it appear that the options were granted at fair market value – the trading price of the stock on that earlier date. In this way, the holder of the option has received in-the-money options and therefore has a head start on the spread between the exercise price and the current trading price. One motive for backdating is to evade the accounting, disclosure and tax consequences of granting in-the-money options.

Accounting Consequences

       8.    The granting of in-the-money options has significant accounting consequences. Essentially, in-the-money options constitute compensation and therefore should be "expensed" (i.e., deducted from revenue as a compensation expense). Specifically, during the relevant period, CTI followed Accounting Principles Board Opinion No. 25, Accounting for Stock Issued to Employees ("APB 25"), which provided that a company did not have to expense options granted at the money. This means that CTI was not required to deduct from revenue any compensation expense for granting options priced at the money on the date of the grant. However, under APB 25, CTI was required to expense any options granted with an exercise price less than the fair market value of the underlying shares on the date of the grant (i.e., in-the-money options). Backdating options would violate this accounting rule if CTI did not expense

4

the in-the-money option grants over the vesting period, and would cause CTI to overstate its profits.

Shareholder Impact and Disclosure Issues

9.  The granting of in-the-money options has significant consequences for shareholders and therefore must be disclosed in the company's filings. CTI acknowledged in its proxy statements that it was required to obtain shareholder approval of its stock option plans in order to meet certain tax requirements and for NASDAQ approval of the trading of the stock to be used for incentive stock options. During the years at issue, CTI's stock option plans, as described in and attached to CTI's proxy statements and approved by shareholders, required that incentive stock options, which qualify for certain beneficial tax treatment, be priced at the money or higher. Backdating options to an earlier date when the stock was trading at a lower price would violate the terms of the plans in that respect. Although the plans did allow CTI to grant in-the-money "nonqualified options" (i.e., options that were not eligible to receive the beneficial tax treatment), CTI repeatedly represented to the public that all stock options (incentive and nonqualified) were in fact granted with an exercise price equal to the fair market value of the underlying shares on the purported date of the grant.

Tax Consequences Regarding Grants to Highly-Paid Executives

10.  The backdating of stock options affects whether a company can deduct the options as executive compensation. Specifically, the Internal Revenue Code ("I.R.C."), Section 162(m), generally limits the deductibility of certain executive compensation to one million dollars per executive per year. An exception is made for certain performance-based compensation, including stock options granted at the money. In its proxy statements and other public filings, as set forth in detail below, CTI falsely represented that all stock options intended

5

to qualify as performance-based compensation under I.R.C. Section 162(m) were granted at the money. The award of in-the money options, due to backdating, could lead a company to violate Section 162(m) and file false tax returns by deducting improperly valued options as executive compensation expense.

## BACKDATING COMPANY-WIDE GRANTS

11. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, engaged in a scheme to backdate millions of stock options to themselves and other CTI employees to days when the stock of CTI was trading at periodic low points. Between 1998 and 2001, ALEXANDER, together with others, backdated every company-wide grant and certain grants of options to new employees.

### The 1998 Company-Wide Grant

12. For the year 1998, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused CTI to issue a company-wide option grant dated "as of" October 9, 1998. However, as ALEXANDER well knew, the Compensation Committee did not approve the grant on that date, but instead did so on or about October 15, 1998. On October 9, 1998, the backdated day selected for the grant, CTI's stock price was $30, the second lowest price of any day in 1998; on October 15, it was $36.50, and generally continued to climb thereafter. Thus, the options were in the money by at least $6.50 per share. The total number of options granted was approximately 744,000, with 250,000 awarded to ALEXANDER (with a paper profit of $1.625 million).

### The 1999 Company-Wide Grant

13. For the year 1999, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused CTI to issue a company-wide option grant dated

6

"as of" October 18, 1999. However, as ALEXANDER well knew, the Compensation Committee did not approve the grant on that date, but instead did so on or about November 24, 1999. On October 18, 1999, the backdated day selected for the grant, CTI's stock was trading at $93, the lowest price since the last shareholder meeting of October 9, 1999, when the shareholders approved the 1999 stock option plan. On November 24, 1999, CTI stock was trading at $128.813 and trending upward; thus, the options were in the money by at least $35.813 per share. The total number of options granted company-wide was over 3.83 million; ALEXANDER was awarded 315,000 (with a paper profit of over $11 million).

The 2000 Company-Wide Grant

    14. For the year 2000, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused CTI to issue a company-wide option grant dated "as of" November 30, 2000, but the Compensation Committee did not approve the grant until December 13, 2000 at the earliest. On November 30, 2000, the backdated day selected for the grant, CTI stock was trading at $86.19, its lowest point since the company's annual meeting on September 14, 2000, when the shareholders approved CTI's 2000 stock option plan. The stock price on December 13, 2000 was $112.125, or about $26 above the November 30, 2000 trading price. The total number of options awarded was over 8.7 million, with 600,000 awarded to ALEXANDER (with a paper profit of over $15 million). Over 3,000 employees received options in this grant.

The 2001 Company-Wide Grant

    15. For the year 2001, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused CTI to issue a company-wide option grant dated "as of" October 22, 2001. However, as ALEXANDER knew, the Compensation Committee did

7

not approve the grant on that date, but instead did so on or about November 28, 2001. CTI's closing stock price on the backdated day of October 22, 2001 was $16.05, the second lowest price of the year in 2001; the price on November 28, 2001 was $21.01, and generally continued to rise. Thus, the options were granted in the money by nearly $5 or more per share. The total number of options granted was more than 9.4 million, with 600,000 awarded to ALEXANDER (with a paper profit of $3 million).

## BACKDATING FOR NEW HIRES

16. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, arranged to reward new employees with in-the-money options backdated to days before the new employees were employed by CTI. This was improper for three reasons. First, ALEXANDER did not disclose or cause to be disclosed to the shareholders that in-the-money grants had been awarded. Second, ALEXANDER did not account for these in-the-money options or cause the in-the-money options to be accounted for correctly. Third, CTI's option plans in effect at the time did not allow the granting of options to non-employees (other than directors). Because the grants were made effective before the new employees joined the company, the grants were awarded to persons who were, as of the backdated date, non-employees of the company, in violation of the shareholder-approved stock option plans.

## THE PHANTOM/FARGO SLUSH FUND

17. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, used fictitious names to generate hundreds of thousands of backdated options, which were then parked in a secret slush fund designed to evade the requirements of CTI's stock option plans. ALEXANDER and others awarded options from this slush fund to certain employees, and caused documents to be falsified in order (a) to hide the slush fund from

members of the Board of Directors of CTI and from CTI's outside auditor, and (b) to conceal any reference to the slush fund in CTI's public filings. ALEXANDER and others called the slush fund "I.M. Fanton," a name inspired by the Broadway show "Phantom of the Opera." Subsequently, ALEXANDER and others renamed the slush fund "Fargo," inspired by the movie of the same name.

18. In or about 1999, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, directed the creation and insertion of dozens of fictitious employee names into proposed grantee lists sent to members of the Board of Directors of CTI charged with approving option grants to employees, and further directed that the fictitious employees each receive a grant of 5,000 options. After the designated members of the Board of Directors of CTI approved the grantee list, ALEXANDER, together with others, directed the transfer of these option grants to "phantom" employees, aggregating at least 200,000 options, into the Phantom/Fargo slush fund.

19. In or about 2000, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused an additional lump sum of over 200,000 options to be deposited into the Phantom/Fargo slush fund, and caused acts of concealment to hide this transfer of options to the slush fund from members of the Board of Directors of CTI and from CTI's outside auditor.

20. In or about 2001, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused the creation and insertion into the proposed grantee list, of approximately twenty-five fictitious employees to be awarded approximately 10,000 options each. After designated members of the Board of Directors of CTI approved the

grantee list, ALEXANDER, together with others, directed the transfer of these "phantom" option grants, aggregating at least 250,000 options, into the Phantom/Fargo slush fund.

21. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, on several occasions, directed the transfer of options from the Phantom/Fargo slush fund to employees of CTI. ALEXANDER and others further caused some of the Phantom/Fargo options to become immediately exercisable, in contravention of the shareholder-approved stock-option plans, resulting in immediate cash gains to the slush fund recipients totaling several million dollars.

## FALSE AND MISLEADING STATEMENTS IN CTI'S PUBLIC FILINGS

22. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, knowingly and intentionally made false statements, misrepresentations, and material omissions in CTI's proxy statements, annual and quarterly filings, and stock option plans.

23. The proxy statements, stock option plans and annual filings were sent to CTI's shareholders by United States mail. The annual and quarterly filings of CTI and the proxy statements sent to shareholders were filed electronically with the SEC in Washington, D.C.

### The 1999 Proxy Statement and 1999 Stock Option Plan

24. On September 7, 1999, CTI filed a proxy statement for an annual shareholder meeting to be held on October 8, 1999 in Melville, New York. The matters to be brought to a vote included: (a) amending the certificate of incorporation to increase from 100 million to 300 million the aggregate number of authorized shares of CTI's common stock; and (b) adopting CTI's 1999 Stock Incentive Compensation Plan (the "1999 Plan"), which the Board of Directors had approved and recommended to shareholders.

25. Below a table in the proxy statement, which disclosed option grants to CTI executives during the prior fiscal year, as the defendant JACOB ALEXANDER, also known as "Kobi Alexander," well knew and believed, the proxy statement falsely stated: "The exercise price of the options is equal to the fair market value of the underlying shares at the date of grant." This statement was false and misleading because the exercise price of the options was not equal to the fair market value of the underlying shares at the date of the grant; rather, ALEXANDER, together with others, had backdated the options to earlier dates when the stock was trading at a lower price.

26. At the annual meeting on October 8, 1999, the shareholders approved the 1999 Plan. As set forth above, with this new Plan in hand, in November 1999, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, issued a company-wide grant backdated to October 18, 1999, and launched the fraudulent Phantom/Fargo scheme.

The 2000 Proxy Statement and 2000 Stock Option Plan

27. On July 20, 2000, CTI filed a preliminary proxy statement regarding matters to be brought to a vote at the annual shareholder meeting to be held in Melville, New York, on September 15, 2000.[3] The matters to be brought to a vote included: (a) amending the certificate of incorporation to increase the number of authorized shares from 300 million to 600 million; and (b) adopting the 2000 Stock Incentive Compensation Plan (the "2000 Plan"), under which up to nine million shares would be newly available for the issuance of options.

28. As the defendant JACOB ALEXANDER, also known as "Kobi Alexander," well knew and believed, the 2000 proxy statement falsely stated that incentive stock

---

[3] The final proxy statement was filed May 11, 2001, and contained the same representations as the preliminary statement.

11

options and any options designated as an I.R.C. Section 162(m) award under the 2000 Plan would be issued at fair market value of the stock "on the grant date." Below a table in the proxy statement, which disclosed option grants to CTI executives during the prior fiscal year, as ALEXANDER well knew and believed, the 2000 proxy statement falsely represented: "The exercise price of the options is equal to the fair market value of the underlying shares at the date of grant."

29. At the annual meeting, the shareholders approved the 2000 Plan. As set forth above, the defendant, JACOB ALEXANDER, also known as "Kobi Alexander," together with others, then backdated a company-wide grant with a false date of November 30, 2000 and continued the Phantom/Fargo slush fund scheme.

The 2001 Proxy Statement and 2001 Stock Option Plan

30. On May 11, 2001, CTI filed a proxy statement regarding matters to be brought to a vote at the annual shareholder meeting to be held in Melville, New York on June 15, 2001. The matters to be brought to a vote included adopting the 2001 Stock Incentive Compensation Plan (the "2001 Plan"), under which 9.7 million shares would be newly available for the issuance of options.

31. As in prior years, and as the defendant JACOB ALEXANDER, also known as "Kobi Alexander," well knew and believed, the 2001 proxy statement falsely stated that incentive stock options and any options designated as an I.R.C. Section 162(m) award under the 2001 Plan would be issued at fair market value of the stock "on the grant date." In addition, below a table in the proxy statement, which disclosed option grants to CTI executives during the prior fiscal year, as ALEXANDER well knew and believed, the proxy statement falsely stated:

"The exercise price of the options is equal to the fair market value of the underlying shares at the date of grant."

32. At the annual meeting, the shareholders approved the 2001 Plan. As set forth above, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, subsequently backdated a company-wide grant with a false date of October 22, 2001.

Special 2001 Proxy Statement and Repricing of Options

33. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, won shareholder approval of a stock option re-pricing plan based on false statements, misrepresentations, and material omissions to the shareholders.

34. On December 13, 2001, CTI filed a proxy statement for a special shareholder meeting to be held in Melville, New York on January 29, 2002. The purpose of the meeting was to approve the re-pricing of underwater options (i.e., options whose exercise price was greater than the current trading price of the stock). If approved, the options would be reissued and re-priced at the fair market value of the stock no earlier than six months and one day following cancellation of the existing options.

35. In this proxy statement, as the defendant JACOB ALEXANDER, also known as "Kobi Alexander," well knew and believed, CTI falsely stated: "Options granted by the Company under the Company's stock incentive compensation plans have exercise prices not less than market price of the Company's Common Stock as reported on the NASDAQ National Market System as of the respective dates of grant." Below a table in the proxy statement, which disclosed options granted in the prior fiscal year (ending January 31, 2001), as ALEXANDER well knew and believed, the proxy statement, referring to the options in the table, falsely

13

represented: "The exercise price of the options is equal to the fair market value of the underlying shares at the date of grant." This statement was false and misleading because the exercise price of the options was not equal to the fair market value of the underlying shares at the date of the grant; rather, the options had been backdated to dates when the stock was trading at a lower price. The proxy statement represented: "The Exchange Offer is intended to realign the exercise price of previously granted options with the current trading price of the Company's Common Stock and thereby better enable the Company to motivate and retain its employees and achieve the Company's business goals." This statement was false and misleading because ALEXANDER, together with others, failed to disclose that the starting point (i.e., the exercise price) of the underwater options was below the fair market value of the underlying stock at the time of the grant.

36.   At the special shareholder meeting, the shareholders approved the re-pricing plan. Backdated underwater options were cancelled on June 20, 2002, and, according to a formula specified in the plan, were reissued and re-priced on December 23, 2002.

Annual and Quarterly Reports

37.   The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused false and misleading statements, misrepresentations, and material omissions in the annual and quarterly reports that CTI filed with the SEC.

38. On April 30, 2002, CTI filed its annual report on Form 10-K, covering the fiscal year ended January 31, 2002. On May 29, 2002, CTI filed its amended annual report on Form 10-K/A, covering the same fiscal year. The financial statements in these reports were false and misleading, as the defendant JACOB ALEXANDER, also known as "Kobi Alexander," well knew and believed, because ALEXANDER, together with others, had caused CTI to fail to

14

expense the backdated, in-the-money options. The financial statements contained the following footnote in relevant part with respect to options:

> The Company applies Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees," and related interpretations in accounting for its option plans. Accordingly, as all options have been granted at exercise prices equal to fair market value on the date of grant, no compensation expense has been recognized by the Company in connection with its stock-based compensation plans.

Because ALEXANDER and others had caused CTI to issue backdated options during calendar year 2001, ALEXANDER well knew and believed that these statements were false. CTI's annual reports for fiscal years ending January 31, 1999, January 31, 2000 and January 31, 2001, filed on April 26, 1999, May 1, 2000 and April 30, 2001, respectively, contained similar statements that ALEXANDER knew to be false. ALEXANDER and others signed all the false annual reports.

39. On April 30, 2003, CTI filed its annual report on Form 10-K, covering the fiscal year ended January 31, 2003. On May 30, 2003, CTI filed its amended annual report on Form 10 K/A, covering the same fiscal year. The financial statements in the Forms 10-K and 10-K/A included financial statements from, among other years, 1999, 2000, 2001 and 2002. These financial statements were false and misleading because the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, had caused CTI to fail to expense the backdated, in-the money options in 1998, 1999, 2000 and 2001.

40. On April 14, 2004, CTI filed its annual report on Form 10-K, covering the fiscal year ended January 31, 2004. The financial statements in the Form 10-K included financial statements from, among other years, 2000, 2001 and 2002. These financial statements

15

were false and misleading because the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, had caused CTI to fail to expense the backdated, in-the-money options in 1999, 2000 and 2001.

41. In addition, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, caused CTI to issue quarterly filings containing financial statements that were false. ALEXANDER knew that CTI had failed to expense backdated options granted with an exercise price at less than the fair market value of the stock on the date of the grant. These false quarterly filings included CTI's quarterly report for the period ending October 31, 2001, filed on December 14, 2001. ALEXANDER and others signed all the false quarterly reports.

## FALSE AND MISLEADING STATEMENTS TO INSTITUTIONAL INVESTORS

42. The defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, made false and misleading statements, misrepresentations and omissions to CTI's institutional investors, which owned a substantial percentage of CTI stock.

43. As the defendant JACOB ALEXANDER, also known as "Kobi Alexander," knew, certain of these institutional investors were opposed to in-the-money options grants, and expressly demanded, in exchange for an affirmative proxy vote sought by CTI, that CTI make a commitment that it would not issue in-the-money options. Aware of these institutional investor concerns, ALEXANDER caused CTI employees to falsely represent to the institutional investors that CTI would not issue any options with an exercise price below the fair market value of the underlying stock on the date of the grant.

## SECURITIES FRAUD

44. The allegations contained in paragraphs 1 through 43 are realleged and incorporated as if fully set forth in this paragraph.

45. In or about and between January 1998 and March 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JACOB ALEXANDER, also known as "Kobi Alexander," together with others, did knowingly and willfully, directly and indirectly, use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that ALEXANDER, together with others, did knowingly and willfully, directly and indirectly: (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon CTI, its shareholders, and members of the investing public, in connection with purchases and sales of the securities of CTI, and by use of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

_____
ROBERT L. CAPERS
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK